The final case in our call this morning is Docket 124155, Forsyth Corporation v. The Department of Revenue, Agenda 9. Counsel. May it please the Court, good morning. My name is Joanne Noggety and I am here on behalf of Appellant Forsyth Corporation. Your Honor, this case gives this Court the opportunity to correct four distinct errors in the Illinois Independent Tax Tribunal's ruling that Forsyth's purchases of metallurgical coke do not qualify for the chemical exemption to the use tax and in the Appellate Court's ruling affirming that decision. First, the Appellate Court erred when it reviewed the Tribunal's decision for clear error even though this case hinges on a pure legal question regarding the Tribunal's matter of first impression interpretation of the chemical exemption and whether that interpretation was correct. Second, even as this case presents a mixed question of fact and law, the Appellate Court still erred when it granted special deference to the Tribunal, a solely adjudicative body without any authority to administer or enforce the tax statutes. Third, the Tribunal erred when it adopted its matter of first impression statutory interpretation of the phrase, quote, effects a direct and immediate change by looking solely to a single general dictionary's separate meanings of direct and immediate. As a result, the Tribunal adopted an interpretation that is inconsistent with an example in the Department's own regulations, the underlying legislative purpose, the accepted legal meanings of the operative terms, and common sense. Finally, even if the Tribunal was correct that Horseth did not qualify for the chemical exemption, it still erred in its determination that Horseth did not satisfy the reasonable cause exception for the abatement of penalty. Here, the operative statutory terms were undefined. Horseth's interpretation of those terms was at the very least reasonable, and there was no controlling precedent or any authority to suggest that interpretation was wrong. This is patently not a situation in which penalties should apply. Turning to the first error, the Appellate Court incorrectly reviewed for clear error a pure question of law regarding the Tribunal's matter of first impression interpretation of the statutory phrase, effects a direct and immediate change. The Appellate Court held that deferential review was appropriate because this case presents a mixed question of fact and law. It does not. In Goodman v. Ward, this Court described the mixed question as one in which the meaning of the governing legal rule is, quote, established, and the dispute involves the application of the established rule to agreed facts. So, for example, if an Appellate Court had previously interpreted the chemical exemption, and the Tribunal's decision had involved applying that interpretation to Horseth's facts, then that would be a mixed question of fact and law. But that is not our case. The Tribunal was not applying an established legal principle. No one disputes, and in fact the Tribunal's ruling was explicit, that in order to determine whether Horseth's quote qualifies for the exemption, the statutory language first had to be, quote, reviewed and interpreted. The Tribunal also acknowledged the absence of any statutory definitions or controlling authority to guide its interpretation. In the absence of such authority, the Tribunal looked to a single general dictionary to assign meaning to the statutory language, and then applied that meaning to the facts. The issue at the heart of this dispute is whether that meaning is correct. Goodman provides clear direction for this exact scenario, stating that, quote, where the historical facts are admitted or established, that there is a dispute as to whether the governing legal provisions were interpreted correctly by the administrative body. The case presents a purely legal question for which review is de novo. The appellate court therefore erred by reviewing the Tribunal's decision under the deferential, clearly erroneous standard of review. With respect to the second error, even if the appellate court is correct that this case presents a mixed question of fact and law, it still should have reviewed the Tribunal's decision de novo, just as it would a decision on the same type of issue rendered by the circuit court. The Tribunal is different from the typical administrative agency. It does not administer or enforce the use tax or any other tax statute. It is a solely adjudicative body that is separate and independent from the Department of Revenue, which is the agency that administers and enforces the tax laws. In finding that the Tribunal's decisions were entitled to deference on mixed questions, the appellate court relied on this court's decision in AFM Messenger v. Department of Employment Security. In that case, this court noted that courts often defer to the decisions of administrative agencies on mixed questions. But AFM Messenger, in all of the cases it cited, in arriving at that conclusion, dealt with an agency's interpretation of a statute the agency either administered or enforced. We have not found any case in which an Illinois higher court has deferred to the legal interpretation of a statute by an agency that is not charged with the statute's administration or enforcement. So what is this body? The Tribunal is an independent administrative agency, but it is set up as a judicial or adjudicative body. It was established under the Tax Tribunal Act, and it came about because prior to the Tribunal's establishment, a taxpayer had two options for resolving a dispute. It could go through the Department's own Office of Administrative Hearings, a decision from which would be appealed to the circuit court and be reviewed under a deferential standard of review. Or it could prepay the tax liability at issue and then bring a refund suit in circuit court, and from there have full appeal rights and no standard deferential review. The Tribunal was established to provide an independent third option where you could get a full independent hearing on the trial, on the dispute, but where you would not have to prepay the liability at issue. How does all of that change the analysis in terms of the deference courts should give to it? Well, here, clearly the Tribunal was established to be on equal footing with the circuit court. It was put in place because they wanted to have an option where you could get that independent, fulsome, fair review of your tax dispute, but without having to prepay the liability. And from there, you could then appeal to the appellate court just like you would a circuit court decision. And so clearly, the legislature was intending to create a third alternative that was equal to the circuit court. Why do you say it was equal to the circuit court? Aren't there other kinds of administrative decision making that is appealable directly to the appellate court? Does that make them the same level as the circuit court? I'm not sure what you mean. It doesn't make them necessarily the same level, but here, it means that, I think, and if you look at the language of kind of the history and the language of why they were established, that it was meant to be kind of in place of the option of going to the circuit court, because they recognized that that disadvantaged taxpayers who don't have the funds available to prepay their liability and file a refund action in circuit court. And the language in the Tribunal Act talks about wanting the tribunal to further the statutory goal of increasing public confidence in the fairness of the state tax system and providing both the appearance and the reality of both due process and fundamental fairness. And I think when you look at all of that language together, that that demonstrates that what the General Assembly clearly didn't contemplate, that you would then have some sort of your appellate review rights, for example, be less than they would be. What about the language in the statute that talks about an independent administrative tribunal with tax expertise? What's the significance of specifying that they have to have tax expertise in your analysis? Well, certainly they intended that the tribunal would be a tax expert forum. They're only going to hear tax disputes. So that's a subject matter expertise. But I don't think that the fact that they are a tax expert forum and have subject matter expertise could impact the deference that the appellate courts and this court gives on questions involving the interpretation of statutory language. The interpretation of statutes is squarely within the expertise in the province of the state's appellate courts. And I don't believe that tax is so exceptional that the court, appellate courts, should stop correcting errors and providing fulsome, denote overview in those cases. And if you look at the court's precedent and how the deference to agencies on mixed questions develops, it does talk about the expertise of agencies. But if you look at it in the context of, for example, in this court's decision in St. Amand, which is cited in respondent's briefs, it talks about the expertise of agencies as active participants in the process of making, enforcing, and administering the laws, and how that makes them an informed source of the legislature's intent at the time of enactment. But the tribunal is not inactive. By statutory design, the tribunal is wholly independent and outside of that rulemaking and enforcement and administrative process and doesn't have that sort of expertise that weighs on, gives them any special insight into what the legislature intended. So, you know, I think that clearly, I think under this court's precedent, it would be an expansion to defer to the tribunal given its unique place, given its unique standing as solely a judicative and independent agency. And I think it's also contradicted by the purposes and would undermine the purposes for which the tribunal was established. Turning to the third error in the, so I've addressed the appellate court's errors in reviewing their decision. I'll turn to the tribunal's error in the decision itself. And I'll start with their interpretation of the chemical exemption. So as this court recently recognized in Corbett v. County of Lake, quote, dissecting an individual word or phrase from a statutory provision and mechanically applying to it a dictionary definition is clearly not the best way of ascertaining legislative intent, end quote. Yet that is exactly what the tribunal did here when it interpreted the statutory language solely by cobbling together the Oxford Living Dictionary's second listed definition of direct and first listed definition of immediate to define a direct and immediate change as, quote, one that occurs at once without any intervening factors or intermediate steps. Applying this definition, the tribunal ruled that Forsett's coke does not qualify for the chemical exemption even though that coke is the carbon component of the carbon monoxide that the tribunal found and responded agrees directly and immediately reacts with the products being manufactured. According to the tribunal, the act of heating the coke, which causes it to naturally oxidize, that is attract an oxygen molecule, is an intermediate step that renders coke's subsequent involvement not direct and immediate. This was an erroneous ruling that is based on a flawed interpretation that ignores every touch point for fulsome statutory instruction. First, the tribunal's blanket prohibition on all intervening factors and intermediate steps. Could we go back to the statutory interpretation, please? Yes. You've criticized the tribunal and the appellate court for its interpretation of the words direct and immediate change, and you've criticized them for relying on the dictionary. Is there plain meaning to those words? Are they necessary to be interpreted? Well, yes. The plain meaning, certainly the exercise is giving plain meaning, but here, as demonstrated in the briefing, that's an exercise of interpretation by virtue of the fact, for example, that there are multiple dictionary definitions, that if you look at contextually appropriate legal definitions of causation, then that tells you one thing, and then if you look at cherry-picking definitions from another dictionary, like the tribunal did, then you get this more restrictive interpretation. And beyond all that, you have to choose, okay, what does the plain meaning, what did the legislature intend? And there you would place it in the context of, well, what does the statute design to do? Can you explain that? Why is this direct and immediate change language there? What is the policy for exemption for that type of chemical? So the broader, the chemical exemption is the subset of the M, M, and E exemption, the machinery, manufacturing, and equipment exemption. And in Chicago Tribune v. Johnson, this court recognized that the purpose of that exemption is to attract new manufacturers to the state and discourage existing ones from leaving. So the chemical exemption is encompassed within that, but it says that in order to qualify for the chemical exemption, the chemical has to affect a direct and immediate change. There is no – Why those chemicals and not other chemicals? Why do some chemicals get a tax exemption and others don't? What is the purpose of this statute? The purpose of the chemical exemption, as far as I can tell, there's no direct legislative history, and this court does not – no higher court or any court, actually, has given any direction on that. But what we do know is that the exemption overall, it has a purpose of encouraging manufacturers. So circling back to go through the issues with the tribunal's exercise in statutory construction and its lacking exercise, the tribunal's blanket prohibition contradicts an example in the department's own regulations of a chemical acting as a catalyst that qualifies for the exemption, even though it must first be superheated to 500 degrees centigrade before any reaction can occur. And that example tells us that the act of heating a chemical to its reactive state is not an intermediate step that renders the exemption inapplicable, and thus belies any suggestion that the department had in mind an absolute prohibition on intermediate steps. Respondent reaches to distinguish this example by saying, no, although aluminum oxide and coke both first have to be heated, in the aluminum oxide example, it's the aluminum oxide that affects the change, whereas in forced-as-coke, it's not solid carbon alone, but rather it's carbon monoxide gas that acts as the reducing agent. But under the department's screen reasoning, for example, water that's used to boil carrots would affect a direct and immediate change, but water that first has to be converted to its gaseous state and used to steam carrots would not. This is an arbitrary distinction that defies common sense, and it illustrates here why the tribunal's interpretation is so overly narrow that it requires the drawing of arbitrary distinctions that simply don't make any sense and contravene the legislative purpose of the MM&E exemption more generally, which is to encourage manufacturers. There was a hearing and a great deal of evidence in this case, correct? Yes. Many, many, many witnesses. There were three expert witnesses on behalf of FORSEC. And so exactly what this catalyst effect, a direct and immediate change upon a product, was explained by the different experts who testified, correct? That's right. And we're not disputing any of the tribunal's findings based on that testimony. So I see that my time is up. And with that, I will urge this court to review the tribunal's determination to no vote and enter a judgment reversing the tribunal's order. Thank you. Thank you. Counsel. Good morning, Your Honors. Good morning. May it please the court, Assistant Attorney General Bridgette DiBattista on behalf of Respondent Appleby, Illinois Department of Revenue. Your Honors, we ask that this court affirm the judgment of the appellate court upholding the decision of the Illinois Independent Tax Tribunal for two main reasons. First, under any standard of review, the tribunal correctly determined that Horsehead's metallurgical coke does not affect a direct and immediate change on its retail products when a distinct chemical compound, carbon monoxide gas, affects these changes. Second, the tribunal's finding that Horsehead was not entitled to an abatement of penalties was not against the manifest weight of the evidence when Horsehead presented no evidence supporting reasonable cause for its failure to pay the tax owed. Regarding the first point, this case involves a mixed question of a taxpayer's entitlement to an exemption. The question is therefore subject to the clear error of standard of review. Horsehead misconstrues the ultimate question for this court as a legal one regarding the proper interpretation of a statute. This is only a threshold question in this case, however. Once the legal question has been resolved, the ultimate question remains whether the unique facts of this case satisfy the statutory standard. That is a mixed question entitled to the deferential clear error standard. So my opponent cites Goodman as indicating that law is established when we look to the clear error standard. Here, the law becomes established once that threshold legal determination is resolved. So that is a threshold question, and we do not dispute that on that threshold question of statutory interpretation, the standard of review is de novo. However, again, once that is resolved, we move to the ultimate question of whether the peculiar chemistry, the facts of this case, satisfy the statutory standard, and that is a mixed question which should be entitled to the clear error standard of review. Adopting Horsehead's approach and applying the de novo standard to the entire inquiry simply because there is an initial statutory question that must be resolved would encourage litigants to simply always challenge the interpretation of the statute to avoid clear error review on the ultimate mixed question. As we know in our brief, the clear error standard has been the standard applied to mixed question determinations of agencies for over 20 years in Illinois. Horsehead provides no reason basis for failing to apply this standard. For its part, Horsehead argues that no deference should be afforded to the tribunal at all. In support, it relies on cases citing an agency's administration of a statute as the basis for agency deference. Horsehead fails to acknowledge, however, that the reason courts cite this basis is that agencies gain expertise through the administration of a statute. Here... It seems counsel's argument on the other side was that this is not an agency, but this is a tribunal created by an agency to act as the... in the judicial capacity. That's correct, Your Honor. However, they're arguing that there should be no deference owed simply because the tribunal is not engaged in day-to-day administration. But if we look to the reason why courts cite an agency's administration of a statute as a reason for deference, it is because through that administration, they gain expertise. Here, however, it is not necessary for the tribunal to engage in day-to-day administration because it is statutorily mandated to have expertise. So in other words, there are avenues for gaining expertise, and certainly administration of a statute is one avenue to gain expertise. In our case, however, the tribunal is required by law to have this expertise. So Horsehead presents no basis to not defer to this expert body. And we cite in our brief the statement of purpose with respect to the Illinois Independent Tax Tribunal Act that the tribunal is to have, quote, tax expertise, and to be, quote, a tax expert forum. ALJs must have, quote, substantial knowledge of state tax laws and the making of a record in a tax case suitable for judicial review. So they are an expert body, and there is a basis for deference, just as there is for an agency that gains expertise through another avenue of administration. Finally and importantly, Horsehead fails to demonstrate how affording deference to agency experts diminishes the independence of the tribunal. Indeed, the tribunal decides cases both in favor and against the taxpayer. So in situations where the tribunal finds in favor of the taxpayer, which does occur on review, the clear error standard would endure to the taxpayer's benefit. So there's simply no indication why following the decision of the tribunal, deferring to that expert body would in any way diminish that body's independence. We would also urge this court to apply a clear error standard to mixed questions from the tribunal, because to do otherwise and to not afford deference would create a two-track system or two tracks of precedent whereby the Department of Revenue's decisions, which they handle cases below 15,000 on clear error, they would receive deference on review, but the tribunal's determination would not receive a deferential standard of review. We ask that to maintain a consistent body of law, that this expert body, just as the expert body of the Department of Revenue, receive deference on mixed questions. But moving beyond the standard of review, and we think it's important to emphasize that this court need not necessarily reach the proper standard of review in this case, because under any standard of review, Horsehead is not entitled to the exemption, which requires a chemical to affect a direct and immediate change on retail products. Here, a distinct gas compound, carbon monoxide, interacts with Horsehead's products, not the metallurgical coke for which Horsehead seeks an exemption. The plain language simply does not allow for a distinct product that is one other than the one for which Horsehead seeks an exemption to be the one causing the change. Horsehead concedes that both heating and chemical reactions are intermediate steps separating the coke from its final products. Nevertheless, it seeks to expand the exemption to allow for, and this is their quote, intervening factors and intermediate steps that do not either disrupt the natural sequence of events or terminate the chemical's involvement. By its terms, the exemption does not allow for intermediate steps. Horsehead points to the heating of water and the heating of aluminum oxide and argues that heated materials should qualify. The problem with this argument is that the zinc and iron products are not reacting here with simply heated coke. Rather, the coke has to be heated to release carbon that must then react with carbon dioxide to produce a distinct gas product, carbon monoxide. So I want to be clear here that this is not simply a matter of heating coke. If the chemical simply had to be heated, that would potentially be a closer question. Heating alone is not all that is required here. There is an additional intermediate step in addition to heating of the carbon dioxide, or excuse me, the carbon, combining with carbon dioxide to form a distinct chemical, carbon monoxide, which is the product that causes the change and not carbon. So it is inaccurate to say that this is simply a case of a heated chemical, which again is not this case and potentially a closer question. There is an intervening step of a chemical reaction that must take place, an intermediate step, which Horsehead concedes is an intermediate step. And because of that, that takes it out of the exemption, which allows only for direct and immediate changes. Could you address the question, the steps for interpretation question, about what those words mean? Certainly, Your Honor. And opposing counsel argues that simply, well, let me just answer Your Honor's question, that those terms mean as the tribunal found at once without intervening factors or intermediaries. Now it is true the tribunal looked to dictionary definitions, but resort to those dictionary definitions simply supported what is the plain meaning that is clear on the face of the statute. So my opponent argues that the tribunal cobbled together dictionary definitions. No, they simply buttressed what is already plain from the language itself with dictionary definitions that supported that plain understanding, which is at once without intervening factors or intermediaries. To the extent that Horsehead argues this is a debatable question, which the department does not concede that this is a closed question. We believe on its face direct and immediate means just that and does not allow for intermediate steps. Is your argument on that, that if you add a chemical compound to a VAT and then you have to add another chemical compound to get to the result you want, neither one of those would be direct and immediate? Correct, Your Honor. That would be an expansion of the plain language here, that it's not simply the chemical, but it's a chemical that reacts with a separate chemical that creates a distinct chemical that qualifies. At that point you are broadening the exemption, which we know from Illinois law we are to construe exemptions narrowly. So if I could buy a chemical that causes a result by adding one chemical, that chemical would qualify for the use tax exemption? If it's a situation where the chemical must interact with a separate chemical, then no, Your Honor. I'm saying you add it and it results in the... Are you saying it has to retain its original composition? Precisely, Your Honor. That it cannot be a distinct chemical that causes the reaction. If the chemical that I add causes the reaction, it qualifies. Exactly, and an example of this... If I buy the same chemical and I have to put two chemicals in to cause a different reaction, neither one qualifies. It is required that there is an intermediate step that these chemicals combine to form a distinct chemical? They act at the same time. Both chemicals go in, they get to the end result. In one case, you have a use tax exemption for the chemical because I don't add anything else. In another case, you don't. Same chemical. So in your example, Your Honor, if it were carbon added and carbon dioxide and each individually were reacting with the iron and the zinc oxides, I think that would qualify. But here that's not what's going on. The carbon and the carbon dioxide combine to form a distinct product, carbon monoxide, that is the chemical that is affecting the change. So it's more than oxygen that's added. It's carbon dioxide. The expert testimony from the professor of metallurgical science testified that it is carbon dioxide combining with carbon to form carbon monoxide. And we explained that in our brief, the chemical formula, in the statement of facts. We do exert testimony to explain the science behind that. Counsel described coke as a catalyst. But doesn't it get used up in the process at the very end? So really, what does it do? Well, Your Honor, I think, and my opposing counsel can correct me if I'm wrong, the exemption allows for chemicals and chemicals acting as catalysts  As I understand it, they are not making an argument with respect to the catalyst portion of the exemption. They have limited it to the chemical aspect. But it's not part of the ultimate product, the zinc oxide and iron oxide, you say, and so why isn't it considered a catalyst-like material? Your Honor, I can't speak to that because I don't know that they have made an argument with respect to the catalyst aspect of the exemption that they have limited it to a chemical, whether the chemical is making a direct or immediate change. And here, because it is not the coke nor the carbon from the coke that interacts with the products, but rather a distinct chemical, it simply doesn't qualify. And to the extent that, of course, it argues this is a debatable question or a close question, which, again, the Department does not concede, we know that any debatable question should be resolved in favor of taxation. So this is a case of plain language statutory interpretation, but in addition to that, we have the construction rule for taxation exemptions that they are to be construed narrowly. In your review of the statute here, do you have any sense of why the legislature drew the lines that they did? What is the policy behind this kind of exemption? And I agree with my opposing counsel that there is not legislative history on this, but from reading cases from other states, there is cases in states where they look not simply to the last step, as here, but allow for a broader exemption for materials used in a chain, a chain of procedures. So legislatures can make that determination that we would like to have a broad exemption that includes chemicals that are merely part of the process or part of the chain, which is the reading that Porsehead is urging here, but that is not the attack that the Illinois General Assembly took. Instead, they limited it to that last step, to the direct and immediate change. So Sabine is a case, an appellate court case from Texas that we cite that discusses this kind of dichotomy of potentially an exemption that's broader where any chemical that's part of the process that's necessary to the process, some states allow that to be part of the exemption. But when there is a statute that requires a direct and immediate change, that is not what is contemplated. It's not a balance for a chain of reactions, which is what Porsehead seeks here. Rather, these words were chosen intentionally, direct or immediate. To draw, I believe, Your Honor, I don't know this, but I believe it is to draw a bright line that we know that there is a direct and immediate change. We're going to limit it rather than allow the exemption. And exemptions are narrow to apply to all chemicals in the process, rather one that affects a direct and immediate change. Ms. DiPatista, before your time runs out, I don't believe there's been any mention yet with respect to the abatement of the penalties. Thank you. Yes, Your Honor. And I know that the appellate court would say that the opposing counsel should not, Porsehead should not have relied upon their own erroneous interpretation. Now, obviously, we took this case and we're all sitting here discussing the different interpretations. So what standard should we imply as to whether or not those penalties should be invoked? Well, Your Honor, I think it's both the plain language that the appellate court and tribunal look to,  direct and immediate does not allow for intermediate. So the interpretation at the threshold is unreasonable. And in the face of that, Horsehead presented no evidence to support its unreasonable interpretation. And Horsehead concedes that this is a fact question and it should only be reversed if the tribunal's decision was against the manifest weight of the evidence. Counsel, isn't it reasonable for Horsehead if they didn't really know if it was an immediate change that it would be reasonable to at least believe or withhold the use taxes until there was some proof as they applied for the exemption? So that means no one can, you know, they have to know before they even go in to apply. So there's no hearing on it like you had. Well, Your Honor, we would say that they cite the lack of precedent as a reason for an abatement of penalties. We would urge this court not to have a rule whereby when there is not an appellate decision on a case, that a taxpayer can avoid payment of penalties. Rather, because exemptions are to be construed narrowly, the prudent course would be to pay the tax rather than to presume when there's no case law supporting their position that they are entitled not to pay the tax. But isn't that what counsel said that's why they had the tribunal so they wouldn't have to pay the circuit court up front? So, Your Honor, I believe with respect to that payment, it's in terms of a protest monies. Yes. I think that's prior to audit, or excuse me, that's after an audit. That's when we're in litigation. But I'm speaking more to when the tax is owed. And we point to in our brief the opportunity that a taxpayer has to seek guidance on an issue through a private letter ruling. Here, courts had the opportunity prior to payment of tax to determine does this qualify? Does this satisfy the exemption? Do you see where it may be a little difficult for this court that took the case to decide that issue to say that there wasn't a legitimate question as to the issue? I think, Your Honor, and I see my time has expired if I can. Sure. Go ahead and answer. That's okay. A showing is needed. So we look to the regulations. A showing of why you made this decision is needed. And there was simply no showing made. Although, of course, the court had the opportunity to do so through employee testimony and had employee testimony with respect to the metallurgical coke and the process here, it, too, could have had employee testimony with respect to why they made this decision, why it was a prudent business decision. They simply presented no evidence outside of their interpretation, which, again, goes against the plain language. They're asking for intermediate interpretation when their language requires immediate and direct change. If the court has no further questions, we would ask that it confirm the judgment of the appellate court. Thank you. Thank you. Case number 12415. Thank you. That was very helpful. I've heard enough. I'm not sure how to take that. I wait with anticipation now. Okay. So just to start, I want to clarify a couple of points. The first, going to your question, Justice Bergfeld, whether this is a catalyst. I did not mean to suggest that the coke here acts as a catalyst. It does not. I was referring to the example in the department's regulations of aluminum oxide that acts as a catalyst. In any end, that example is analogous because whether it's a chemical or a chemical acting as a catalyst, the standard applies, and that's whether the chemical or catalyst affects a direct and immediate change on the product. And then, to go through respondents' various points that were made, I would start by addressing the issue of what the ultimate question in this case is, and I think the respondent is misconstruing the ultimate question, and it's not whether the tribunal correctly applied the interpretation to the facts. It really is whether the tribunal statutory interpretation was correct or not, and the respondent doesn't dispute that that issue should be reviewed de novo. And I would just point out that even if the respondent is correct, that then the remaining question is a mixed question. This court could only review that for clear error if it accepts the tribunal's cursory statutory interpretation. If it finds that the tribunal's interpretation is wrong and is a practical matter, then it would need to provide a fulsome de novo review of the application to horsehead facts. With respect to the point about deference to the tribunal, I think that respondent failed to address in any meaningful way the fact that giving deference to the tribunal, an administrative, solely adjudicative agency that neither administers or enforces, would be a significant expansion of this court's precedent, and turning back to a point that I touched on earlier where the tribunal's mere tax expertise is a sufficient basis for deferential review, and respondent suggests that yes, and that it would undermine the tribunal's statutory mandate of serving as a tax expert forum not to do that. And I think that's incorrect. I think that deference to the tribunal would not in any way undermine its tax expertise, but what it would undermine is its statutory purpose, which is to increase public confidence in the fairness of the state tax system and provide both the appearance and the reality of due process and fundamental fairness. And Folsom Review, de novo review of the tribunal's legal decisions, furthers that goal by allowing it against the opportunity to vet the tribunal's decisions and in doing so it enhances the tribunal's standing as a tax expert forum by legitimizing those proceedings and it also mitigates perceptions of bias. And I think that those functions are especially crucial when you have a tribunal that's been established with these goals in mind. Very briefly on the issue about uniformity, respondent suggests that by failing to give the same deferential review to the tribunal's decisions as to the decisions of the department of administrative review process. I will point out that the department's administrative process is now generally confined to amounts in dispute of less than $15,000 and as a practical matter, virtually none of those cases are going to be appealed to the circuit court and then on up to the appellate courts and absent review by those higher courts, those decisions will not result in guiding precedent that is going to govern the resolution of future disputes. Instead, those cases are going to come out of the tribunal and refund litigation in the circuit court. And uniformity and consistency in the law requires that those decisions be reviewed under the same non-presidential standard. Turning to the discussion about the interpretation of the statute at issue, the chemical exemption, respondents suggest that we are trying here to read additional qualifications or somehow expand the plain language and we're not doing that. As discussed in detail in our brief, the quoted definition that respondent referred to is entirely consistent and taken from the legal dictionary meanings of the statutory terms. There is nothing that suggests that there is this absolute prohibition on intermediate steps that respondent keeps referring to. That doesn't come in. That was read into the language by the tribunals. What the tribunal is actually doing here is reading in these exceptions that just contravene common sense. I think that respondents attempt to defend the example of where you have two chemicals, you buy them, you mix them together, somehow they instantaneously react or chemically bond together and then they react with the product. That doesn't qualify, but if you were to put those same chemicals in, they didn't react with each other, they both reacted with the product, well then both of them somehow qualify. Frankly, I think that's just silly. How do you react to, and I understand there are layers of this, but the examples that are provided in the regulations, for example, the one chemical being applied to copper, and copper changes immediately. I see it as etching. That's the example that's used in the regulation. That sounds like a direct, immediate change with nothing happening other than one chemical interacting with another chemical. That's the example that's given in the regulations. Right, and clearly that is the clearest case that you could give of a direct and immediate effect. You buy a chemical, you pour the chemical on, it affects a direct and immediate change. We're not those facts, but I believe that we're indistinguishable in any material away from those facts, because here what you have is you have carbon monoxide, or carbon from the coat that attracts an oxygen molecule from the carbon dioxide within the kiln, and that becomes carbon monoxide gas, and that then directly and immediately reacts, and so to put it in everyday terms, if you walk straight from point A to point B, you proceed directly, whether you walk alone or whether someone joins you along the way. If you have two chemicals and you put them in a vat and they both react directly and immediately, that's direct and immediate. If you put them in and they bond together and then they react with the product. I think under any sensible construction, that is also direct and immediate, and by reading into the language this absolute prohibition on intermediate steps, the respondent and the tribunal are forcing the department to draw arbitrary and hair-splitting distinctions that just don't make sense and will result in treating taxpayers who are clearly similarly situated differently, and that can't be what the legislature intended when it adopted this MME exemption with the express purpose of encouraging manufacturing within the state and stopping manufacturers from leaving the state for more tax-friendly jurisdictions. Can you respond to the argument, I'm still struggling about why we have this statute. Opposing counsel suggests that other states have very different language, chain of events, and that here our legislature chose very specific, more narrow words. Can you respond to that argument? So there are a variety of chemical equipment exemptions, some of which have, and they all have different language. If there are 30 different statutes that have this type of exemption, then there are probably at least 25 formulations of it. I don't know exactly why they chose the direct and immediate language here, but I do know that there is absolutely nothing to support the suggestion that they were meaning to look at the very last step, or the last link. I think direct and immediate is meant to say, well it has to be something more than just used somewhere in the process, but I don't think that it was designed to draw these sorts of distinctions between, well, it has to be heated and that heating causes some sort of physical or chemical change, versus absolutely nothing at all happens to it, and that's what direct and immediate means. I see that my time is up. I thank the court for its attention today, and I would ask that you review de novo, the tribunal's determination, and make the decision to reverse. Thank you. Thank you. Case number 124155, Orsett Corporation, Justice Department of Revenue, will be taken under advisement as agenda number nine. Ms. Nogge and Ms. DiBattista, we thank you for your argument.